## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **AMERICAN PROCESS EQUIPMENT COMPANY, INC.,**  ) | |
| ) | |
| **Plaintiff,**  ) | |
| ) | **Civil Action No. 04-10736 (NMG)** |
| **v.**  ) | |
| ) | |
| **ATLANTIC MUTUAL INSURANCE COMPANY**  ) | |
| **Defendant.**  ) | |

## JOINT PRE-TRIAL MEMORANDUM

The parties hereby submit this Joint Pre-Trial Memorandum in accordance with Local

Rule 16.5 of the United States District Court, District of Massachusetts:

**1.    Summary of the Evidence**

Plaintiff's Statement of the Case

Plaintiff anticipates that the evidence will show the following:

APEC is an engineering business that specializes in the development and

manufacturing of complex machine parts, including, *inter alia*, parts that are used for the

construction of nuclear power plants, railroad lines and bridges.  APEC utilizes large,

sophisticated and expensive machinery in all aspects of its business.  APEC is operated by Mr.

Paul X. O'Neill, Jr., a licensed engineer who is a nationally recognized expert in the type of

machinery that APEC uses to build machine parts for its customer's projects.

In 1998, Atlantic Mutual agreed to provide insurance coverage for APEC.  At the time

Atlantic Mutual drafted the insurance policy for APEC, it was aware of the nature of APEC's

business and the sophisticated machinery APEC utilized for its projects.  Atlantic Mutual was

also aware that APEC had acquired most of its machines from its predecessor-in-interest, PX

Engineering, Inc., a company that was founded by Mr. Paul X. O'Neill, Sr.   In addition, prior to

drafting the insurance policy, Atlantic Mutual inspected APEC's  facility at 295 Lincoln Street,

Hingham, Massachusetts (the "Hingham Property") and its machines.  The policy provided

property coverage for, *inter alia*, all of APEC's machines in the amount of $3,000,000 and

business interruption in the amount of $1,500,000.  APEC's yearly premium was approximately

$18,000.

In or around late March and early April, 2002, the Hingham Property experienced

significant water leaks in its roof and many of APEC's machines were severely damaged as a

result thereof.  Shortly after experiencing the loss, APEC submitted a written claim to Atlantic

Mutual for $3,000,000 – the policy limits for property damage.

In compliance with the insurance policy, APEC provided a detailed description of each

piece of machinery that was damaged, including the scope of the damage, an estimate of the cost

to repair the damaged machines and an estimate of the cost to replace machines in the event that

repairs were not economically feasible.  In addition, APEC also submitted a business interruption

claim, and a description of its lost revenues as a result of its machinery being inoperable.

After APEC submitted its claim for insurance proceeds in April 2002, it cooperated fully

with Atlantic Mutual's investigation of the claim by, *inter alia*, accommodating Atlantic

Mutual's request to inspect the damaged machines and the Hingham Property, by submitting to a

sworn statement under oath (APEC's President, Paul X. O'Neill, Jr. gave sworn statements on

three separate occasions) and by producing or making available thousands of pages of documents, receipts, invoices and other of APEC's business records to assist Atlantic Mutual in processing this claim.

Despite APEC's cooperation, Atlantic Mutual continued to investigate this claim for nearly two years and failed to acknowledge that APEC's claim is a covered loss under the policy or make any insurance proceeds available to APEC so it could repair and/or replace the damaged machines and continue with its business operations.  This stonewalling, it appears, was an attempt by Atlantic Mutual to "run out the clock", as the policy had a two-year limitation period.

As a result of Atlantic Mutual's failure to acknowledge that APEC's casualty was a covered loss and make insurance proceeds available under the policy, APEC's business operations have effectively been halted and APEC has lost numerous, lucrative business opportunities as a result thereof.

### The Casualty

There is little dispute that there was a substantial rain and wind storm in late March and/or early April 2002 that caused flooding at the Hingham Property.  In fact, a former APEC employee, Gerrard A. Carreau, who defendant relies on in disputing certain of APEC's claims, testified that "I know we had a big storm that week [late March or early April].  That big storm must have been for three days.  I know it was a storm and it was windy and the water was all over.  It came in all over the place."   APEC took necessary and reasonable measures to protect its machines ("we covered the machines that were getting wet", "we tried wiping machinery down" and "we dried everything off, we wiped everything off, dried everything off").

While defendant has claimed that APEC failed to take reasonable steps to protect its

3

machines from being damaged by the water leaks, it is important to understand that the Hingham facility was larger than a football field and at the time of the loss it held more than 200 pieces of heavy machinery. It is also important to realize that many machines are more than three stories tall and weigh over 12½ tons. Thus, moving, covering and cleaning the machines is no simple task.

The evidence shows that despite APEC's best efforts to protect its machines, many of them were penetrated by water. Paul X. O'Neill, Jr. and Mr. Carreau have both testified that each of the machines identified in APEC's Proof of Loss incurred damage as a result of the water leaks.

### The Effect of Water on APEC's Machinery

As mentioned above, APEC's machines are used for building machine parts that are used in high tech projects such as the construction of nuclear power plants, railroad lines and bridges and the like. In APEC's line of work, precision is critical and its machines must perform calibrations to an exacting degree. The formation of rust on these machines leads to inaccurate calibrations that could have devastating consequences when considering the types of public projects in which APEC is involved.

### The Damaged Machinery

As a result of the casualty at issue here, 30 pieces of machinery and 4 overhead cranes were damaged. APEC conducted a thorough examination and analysis of its damaged machines and provided Atlantic Mutual with a comprehensive document detailing its conclusions. In this document, APEC identified each piece of machinery that was damaged as a result of the casualty, the cost to repair the damaged machines and/or the cost to replace the damaged machines in the

4

event repairs are not economically feasible.  According to APEC's estimate, repair and/or

replacement costs, including rigging and shipping costs, exceed the $3 million dollar policy

limits.  In addition, APEC has retained the services of Jim Leigh, founder of Pyramid Rebuild &

Machine, LLC, a company that specializes in repairing, rebuilding, realigning, retrofitting,

installing and remanufacturing large machine tools identical to those used by APEC.  Mr. Leigh

examined APEC's records, met with Mr. O'Neill and inspected APEC's damaged machines that

were still available for inspection.  Based on his 27 years of experience working in this

specialized field, Mr. Leigh concluded that the cost of repair and/or replacement for certain of

APEC's damaged machinery, excluding the overhead cranes, totals $2,074,180 for the machines

available for repair and $2,720,203 for replacement costs for the damaged machines.[1]

  During its supposed investigation of APEC's claim, Atlantic Mutual retained the services

of Peterson & Associates to inspect APEC's machines.  Peterson & Associates, it appears, did

not have the expertise to inspect properly APEC's machines, and it retained the services of Bruce

Walker to assist in evaluating the extent of damage sustained by APEC's machines.  During his

deposition, however, Mr. Walker testified that he had <u>no</u> experience in inspecting and/or

repairing most of the machines APEC claimed were damaged, and in fact, had performed only

about 10-15 machine inspections prior his work on APEC's claim – mostly involving claims

with one or two pieces of damaged machinery.  In addition, Mr. Walker testified that he

conducted only a "casual" inspection of most of the damaged machines and did not disassemble

---

[1] Mr. Leigh's report does not include foundation costs or the cost of materials or labor for final installation in his repair cost valuation and the total replacement cost valuation does not include trucking, rigging or disassembly fees that may apply.

any of the machines to determine if water had penetrated the internal components of the damaged

machines or to see if there were any signs of rust in the internal components of the machines.

Despite Peterson & Associates' inexperience and casual inspection of the damaged

machinery, Peterson & Associates nevertheless acknowledged that APEC's machines were

damaged, but asserted that all of the machines could be repaired at a total cost of $580,500

(although, at Mr. Walker's deposition, he acknowledged that several machines' electric control

panels were damaged by water and that these machines would need to be replaced).

Even though its own supposed "experts" concluded that APEC's machines were damaged

and that it would cost a minimum of $580,500 to repair these damaged machines, Atlantic

Mutual did not offer APEC any money to resolve this claim so APEC could repair  and/or

replace its damaged machines and continue with its business operations.

**Business Interruption Claim**

As stated above, APEC's business was essentially shut down as a result of water damage

to its machinery resulting from the casualty in late March and early April 2002.  APEC was

unable to complete numerous projects and was forced to refer many jobs to other vendors.  For

instance and by example only, at the time of the casualty, APEC was working on numerous

projects for Amtrak, including, without limitation, the rehabilitation of the Pelham Bay Bridge

and the Niantic River Bridge.  Many of the items manufactured by APEC for these projects were

damaged by the water leaks and had to be re-done.  APEC has estimated that the costs of repair

and replacement for these jobs is in the sum of $400,000.[2]   Other projects that APEC was unable

---

[2] APEC also lost significant income due to its inability to perform under a lucrative contract it had with Amtrak to retrofit many of its bridges for Amtrak's high-speed rail service from Boston to Washington D.C.

to complete or had to reconstruct as a result of its machinery being damaged include, without limitation, an order to redesign and manufacture a Versa-Table Blade Mill; an order to construct a windmill turbine for a company called Vien Tek; and an order to construct a plastic extrusion for a company called Addex. These lost business opportunities cost APEC hundreds of thousands of dollars.

In addition, in the three years immediately preceding the casualty, APEC had revenues of approximately $1,600,000 per year. As a result of the damage caused by the water leaks, APEC's revenues fell by approximately $330,000 during the second quarter of 2002.

## DEFENDANT'S STATEMENT OF THE CASE

American Process Equipment Company ("APEC") operated a custom machine shop. The company was formed in 1992 by Peter O'Neill and Paul O'Neill, Jr. Only the latter continues to be associated with the company.

The relationship between APEC and PX Engineering, Inc. ("PX Engineering"), a company founded and run by the O'Neills' father, Paul O'Neill, Sr., is ambiguous at best. PX Engineering dissolved in 2003, but for several years before that operated out of the same facility as APEC. According to both Paul O'Neill, Sr. and Paul O'Neill, Jr., when PX Engineering dissolved, it "gave" its machines to APEC. Nonetheless, APEC has not provided any documentary evidence (e.g., a written assignment) that PX Engineering assigned any of its machines to APEC. Accordingly, it would appear that most of the allegedly damaged machines belong to PX Engineering, not APEC.

APEC operated its business out of a building located at 295 Lincoln Street, Hingham,

7

Massachusetts (the "Hingham Facility"), which originally it leased from an O'Neill family trust. In March 1997, the trust sold the Hingham Facility to Building 58 LLC ("Building 58"). In August 1997, APEC and Building 58 entered into a written lease that contained an expiration date of April 30, 2001.

The roof of the Hingham Facility had a long history of leaks.  Documentary evidence demonstrates that leaks were reported and repaired in September 1997, October 1997, December 1997, January 1998, November 1998, February 1999, June 1999, November 1999, and February 2000.

APEC's lease with Building 58 expired on April 30, 2001.  However, as of that date, APEC had no plans to relocate its business.   APEC remained in the Hingham Facility despite expiration of the lease and over the objections of Building 58.  Building 58 served APEC with a Notice to Quit on February 27, 2002.  Then, on April 5, 2002, Building 58 instituted eviction proceedings against APEC.  At the time Building 58 initiated the eviction proceeding, almost one year after APEC's lease had expired, APEC had no plans to relocate its business.  On May 8, 2002, the court ruled in Building 58's favor.  However, APEC still had no plans to relocate.

To make matters worse for APEC, its business had been failing for some time.  Between March 2001 and March 2002, the number of full-time APEC employees declined considerably. As of March 2002, APEC's business had declined fifty percent (50%) from the previous year.

APEC alleges that sometime between late March and mid-April 2002 -- APEC's story as to the date of loss has changed over time and APEC still has not identified the exact date or dates of the alleged loss -- the roof at the Hingham Facility leaked during a rainstorm causing water damage to various machines, equipment and works in progress.

8

Atlantic Mutual Insurance Company ("Atlantic Mutual") issued a property insurance policy (the "Policy") to APEC in 2001.

APEC notified Atlantic Mutual on April 22, 2002 that certain machines were damaged as a result of the leak in the roof. Thereafter, Atlantic Mutual promptly made contact with APEC, and Atlantic Mutual had its inspectors on the scene within days after it received notice of the alleged loss. Any delays in Atlantic Mutual's investigation were due largely to Mr. O'Neill's refusal to submit to an Examination Under Oath in Boston, and APEC's failure to timely produce documents relevant to the Claim as required under the Policy. Atlantic Mutual adopted and implemented reasonable standards for the prompt investigation of APEC's claim. Atlantic Mutual contacted and frequently communicated with APEC concerning the adjustment of the alleged loss.

In the months following the March–April 2002 leaks, the roof continued to leak and water continued to leak onto APEC's machines, during which time APEC made virtually no effort to cover or otherwise protects its machines. In fact, APEC has provided video evidence of rain leaking on uncovered machines on July 19, 2002.

On or about July 18, 2002 APEC filed a written claim under the Policy alleging in excess of $3 million in purported losses (the "Claim"). APEC claimed damage to machines, equipment and works in progress, and also alleged that it suffered business interruption losses that APEC has failed to specify.[3]

APEC is not entitled to payment of the Claim, however, because APEC intentionally

---

[3] On or about November 25, 2002, while continuing its investigation of APEC's Claim, Atlantic Mutual issued an advance to APEC of $50,000, subject to a full reservation of rights. That advance was based, in part, on APEC's representations concerning its losses.

misrepresented material facts concerning its Claim, thereby voiding the Policy.  Specifically, the Policy provides as follows:  "This policy is void in any case of fraud by you as it relates to this policy at any time.  It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning . . .[t]his policy;  . . . [t]he Covered Property; . . . [y]our interest in the Covered Property; or  . . . [a] claim under this policy."    Here, the Policy is void, APEC is not entitled recover on its Claim, and APEC must return the $50,000 advance that Atlantic Mutual paid to it because APEC misrepresented material facts concerning its Claim.

APEC misrepresented material facts to Atlantic Mutual concerning the cause and extent of damage allegedly caused to APEC's equipment and the cost of repairing or replacing the allegedly damaged machines.[4]  Specifically, APEC claimed that machines were damaged by the leaking roof in March-April 2002 when, in fact, many of the machines were already rusted, inoperable, disassembled, in complete disrepair, or little more than junk as of March-April 2002.  Other machines were damaged as a result of age, wear, and prior poor maintenance rather than roof leaks in March-April 2002; and still others were damaged subsequently as a result of APEC's failure to cover the machines or to take other reasonable precautions to prevent further damage resulting from the leaking roof.  Some of the machines suffered no damage at all in March-April 2002.

Moreover, APEC grossly misrepresented the cost of repairing or replacing the allegedly damaged machines.  Some of the machines could have been "repaired" simply by wiping water from the machines and oiling them; nonetheless, APEC claimed extravagant repair costs.  APEC

---

[4] APEC also misrepresented that it owned all the allegedly damaged equipment for which it sought coverage.  In fact, it is undisputed that many of the allegedly damaged machines were acquired by PX Engineering, not APEC,

repaired some of the machines after the alleged loss and, according to former employees, those machines were operable.  Nonetheless, APEC claimed that those machines still required repair, with costs exceeding dozens, even hundreds, of thousands of dollars.  In many instances, even APEC's "expert" estimated repair costs considerably lower than those APEC claimed.  For example, in one instance, APEC's expert estimates repair costs of $23,500, while APEC claimed repair costs of $160,000.

APEC's estimated replacement costs are gross misrepresentations, as well.  For example, APEC claimed replacement costs of $200,000 for a machine for which APEC paid only $2000 in 1999.  In another instance, APEC purchased a machine for between $25,000 and $30,000 in 1999 and yet claimed a replacement cost of $160,000.   APEC also claimed a replacement cost of $400,000 for a machine that APEC purchased for $25,000 in 2001.  APEC claimed a replacement cost of $150,000 for a machine that it purchased for $5000 in 2001.  And, most strikingly, APEC claimed replacement costs of $40,000 and $70,000, respectively, for machines that it purchased for $105 each less than a year before March-April 2002.

APEC also is not entitled to payment of the Claim because APEC did not take steps to protect its equipment after the alleged March-April 2002 leaks, despite the fact that the roof continued to leak and water continued to land on machines.  Specifically, the Policy requires that, in the event of a loss,  APEC must "[t]ake all reasonable steps to protect the Covered Property from all further damage, and keep a record of  expenses necessary to protect the Covered Property, for consideration in the settlement of the claim."  APEC breached that provision.  For example, a May 1, 2002 inspection of the Hingham Facility revealed that no machines were

and that APEC has produced no documentary evidence demonstrating that PX Engineering assigned any machinery

11

under tarps to protect them from the rain.  Moreover, an APEC video dated July 19, 2002 reveals

rain falling on uncovered machines and APEC making no effort to protect the machines.  As a

result of APEC's breach of the Policy, it is not entitled to payment of its Claim.

2.     **Facts Established by the Pleadings or By Stipulation**

     a.     Plaintiff, American Process Equipment Company**,** Inc., is a Massachusetts

        corporation, which at relevant times to this lawsuit had a principal place of

        business at 295 Lincoln Street, Hingham, Massachusetts;

     b.     Defendant, Atlantic Mutual Insurance Companies, is a corporation duly formed

        and licensed to engage in the insurance business in this Commonwealth and has a

        usual place of business in Melville, New Jersey;

     c.     Atlantic Mutual sold a policy of insurance to APEC for the time period June 30,

        2001 through June 30, 2002 (the "Policy");

     d.     APEC submitted a claim for insurance proceeds available under the Policy that

        was received by Atlantic Mutual on or around July 29, 2002; and

     e.     The Policy limits available under the policy are $3,000,000 for property damage

        and $1,500,000 for business interruption.

3.     **Contested Issues of Fact**

     a.     Whether or not the casualty – the water leaks in late March and/or early April

        2002 that APEC alleges damaged its machines– is a covered loss under the Policy;

        and

     b.     the amount of APEC's damages in order to repair and/or replace its damaged

_____

to APEC.

machines as a result of the water leaks in late March and/or early April 2002 and the amount of APEC's business interruption as a result of the casualty.

c.      Whether a rain and/or wind storm in late March or early April 2002 caused substantial leaking of the roof at APEC's Hingham Facility.

d.      Whether, in its Claim, APEC intentionally and fraudulently misrepresented to Atlantic Mutual the cause and extent of damage to APEC's machines allegedly caused by a leaking roof at its Hingham Facility in March-April 2002.

e.      Whether, in its Claim, APEC intentionally and fraudulently misrepresented to Atlantic Mutual the costs necessary to repair or replace machines that APEC alleges were damaged by water leaking from the roof at APEC's Hingham Facility in March-April 2002.

4.    **Jurisdictional Questions**

The parties are not presently aware of any such issues.

5.    **Questions Raised By Pending Motions**

Prior to the November 2 Pretrial Conference, Atlantic Mutual will file a motion to exclude from trial the testimony of James Leigh, whom APEC has designated as its expert with respect to the repair and/or replacement costs of the allegedly damaged machines.

6.    **Issue of Law, Including Evidentiary Questions**

The parties are not presently aware of any such issues, but reserve the right to raise such issues in their trial briefs.

**Requests To Amend The Pleadings**

Atlantic Mutual requests leave to amend its Answer solely to include two additional affirmative defenses, each of which simply clarifies an existing affirmative defense and will, in not way, prejudice or surprise APEC.  Atlantic Mutual's Ninth Affirmative Defense is as follows: "Plaintiff's claims are barred or must be reduced according to the terms and conditions of the defendant's insurance policy at issue in this case."  Atlantic Mutual requests leave to add two additional defenses to clarify that Ninth Affirmative Defense:

<b>TWELFTH AFFIRMATIVE DEFENSE</b>

The policy is void because APEC intentionally concealed and/or misrepresented material facts concerning its Claim.

<b>THIRTEENTH AFFIRMATIVE DEFENSE</b>

Atlantic Mutual is under no obligation to pay APEC's Claim.

**7.    Additional Matters To Aid The Disposition of the Action**

The parties are not presently aware of any such matters.

**8.    The Probable Length of Trial**

The parties anticipate that trial of this matter will require seven full trial days.

**9.    Witnesses**

Each party reserves the right to call to testify at trial one or more of the following witnesses in their respective cases-in-chief and each reserves the right to call to testify any rebuttal witnesses.

Plaintiff's Witnesses

APEC expects to call some or all of the following witnesses:

14

1.      Paul O'Neill, Jr., President, American Process Equipment Company, Inc., 3088 Interstate Parkway, Brunswick, Ohio 44212.

2.      Paul X. O'Neill, Sr., Deerfield Beach, Florida.  Mr. O'Neill was the founder and president of PX Engineering.

3.      Peter O'Neill, 50 Bridle Path, North Andover, MA 01845.

4.      Richard Benedetti, Carey, Maddelini, Benedetti Associates, Peabody, MA.

5.      Neil Andersen

6.      Gerrard Carreau

7.      George Scruton (former APEC employee).

8.      Paul Trendowicz, Sea-Chain/Building 58 LLC, 118 Beach Street, Cohasset, MA 02025.

9.      David Dwyer, 295 Lincoln Street, Hingham, MA.

10.     Richard Verrault, President of GL&V, Inc., Nashua, NH.

11.     Nicholas Babyak (GL&V, Inc.'s controller), Nashua, NH.

12.     Michael Voll, President of Northcoast Rebuilders (a/k/a National Re-manufacturer).

13.     Paul Mandelbaum, President of Lucas Precision.

14.      Robert Danahey.

15      Ronald G. Moore and other employees at Plant & Machinery Inc., 8705 Katy Freeway, Suite 300, Houston TX 77024.

16.     William Liggett.

17.     Ronald Moore.

18.     Michael Williams.

19.     Doug Dodge, Eastern Adjustment Co., Inc., 649 Main Street, Brockton, MA.

20.     James F. O'Keefe, Atlantic Mutual Insurance Companies, 800 Village Walk, Guilford, CT; and

21.     James Leigh, Pyramid Rebuild & Machine, 123 S. Thomas Road, Tallmadge, OH 44278.

Plaintiff reserves the right to supplement its witness list prior to trial.

Defendant's Witnesses

Atlantic Mutual intends to call the following witnesses:

(a)     Neil Andersen, 222 High Street, Hingham, Massachusetts

(b)     Richard Benedetti, 200 Lake Street, Peabody, Massachusetts

(c)     Gerard Carreau, 43 Mattapoisett Road, Rochester, Massachusetts

(d)     Paul Dalton, 162 Hamilton Street, Saugus, Massachusetts

(e)     Douglas Dodge, Eastern Adjustment Company, Inc., 649 Main Street, Brockton, Massachusetts

(f)     David Dwyer, 34 Daedelus Circle, Scituate, Massachusetts

(g)     Paul O'Neill, Jr. American Process Equipment Company, Inc., 3088 Interstate Parkway, Brunswick, Ohio 44212

(h)     James O'Keefe, Atlantic Mutual Insurance Company, 800 Village Walk-151, Guilford, Connecticut

(i)     Ronald Soares, 49 Parsons Walk, Berkley, Massachusetts  02779

(j)     Joseph Sugar, Sea Chain, LLC 349 Lincoln Street, Hingham, Massachusetts

(k)     Bruce Walker, 179 Haydenville Road, Whately, Massachusetts

**10.    Proposed Exhibits**

Plaintiff intends to proffer into evidence the following documents and tangible

16

things and reserves the right to supplement this list prior to trial:

1.    APEC's policy of insurance with Atlantic Mutual, Policy No. 765-0-76-73-0000 (the "Policy");

2.    APEC's lease with Building 58 LLC;

3.    Copy of Underwriting File including Loss Control Report;

4.    Atlantic Mutual document titled "Web Quote/Policy View";

5.    APEC's Sworn Statement in Proof of Loss;

6.    APEC log/calender book;

7.    APEC's telephone records for the month of March and April, 2003;

8.    October 29, 2002 letter to Mr. Will Cassidy from Keith Kallberg, including photographs and other attached documents;

9.    Boston Mass - Preliminary Local Climatological Data for March/April 2002;

10.   Preliminary Climate Data Worksheet March/April 2002;

11.   Eastern Adjustment Company, Inc. document titled First Report prepared by Douglas Dodge on May 17, 2002;

12.    Atlantic Mutual computer entries concerning APEC's claim;

13.   August 2, 2002 letter to Mr. Michael Mahoney from Rich Warkenthien;

14.   May 17, 2002 letter to Mr. Rich Warkenthien from William F. Cassidy, including report prepared by Bruce Walker;

15.   Spreadsheet prepared by Douglas Peterson & Associates and Will Cassidy concerning the repair costs to APEC's damaged machinery dated July 14, 2002;

16.   Standard & Poor's Insurer Profile for Atlantic Mutual;

17.   Photographs and videos of the loss and the damage to APEC's machines;

18.   APEC's maintenance records concerning it machines damaged by the loss;

19.    Document dated November 5, 2004 from Stoy Machine & Gear, Inc. identifying jobs that APEC referred to it for completion;

20.    Documents showing interruption in service between APEC and its customers, including, without limitation, contracts between APEC and its customers;

21.    APEC's spreadsheet concerning its damaged machinery as a result of the loss and documents showing the value of the damaged property and the estimated cost of repairs;

22.    Auction report dated November 6, 2002 prepared by Ronald G. Moore, Vice-President, Plant & Machinery, Inc.;

23.    Documents relating to machinery shipped from APEC's Hingham facility to Ohio;

24.    File folder titled "Betts Vertical Turret Lathe" containing maintenance records and work order records and/or requests prior to the loss;

25.    File folder titled "Okuma Engine Lathe (LS)" containing maintenance records and work order records and/or requests prior to the loss;

26.    File folder titled "Okuma Engine Lathe (LT)" containing maintenance records and work order records and/or requests prior to the loss;

27.    File folder titled "Clausing Engine lathe" containing maintenance records and work order records and/or requests prior to the loss;

28.    File folder titled "Niles Bement Pond Vertical Turret Lathe " containing maintenance records and work order records and/or requests prior to the loss;

29.    File folder titled "Lucas Horizontal Boring Mill" containing maintenance records and work order records and/or requests prior to the loss;

30.    File folder titled "Comet Milling Machine" containing maintenance records and work order records and/or requests prior to the loss;

31.    File folder titled "Osuma SR Lathe" containing maintenance records and work order records and/or requests prior to the loss;

32.    File folder titled "Fiji Seiki Gap Bed Engine Lathe" containing maintenance records and work order records and/or requests prior to the loss;

33.    File folder titled "Machine" containing maintenance records and work order records and/or requests prior to the loss;

34.    File folder titled "APEC Versa-Table CNC Rotary Table" containing maintenance records and work order records and/or requests prior to the loss;

35.    File folder titled "Ooya Vertical Milling Machine. CNC" containing maintenance records and work order records and/or requests prior to the loss;

36.    File folder titled "WMW- Union CNC Horizontal Boring Mill, Floor Type" containing maintenance records and work order records and/or requests prior to the loss;

37.    File folder titled "Lucas CNC Table- Type Horizontal Milling Machine" containing maintenance records and work order records and/or requests prior to the loss;

38.    File folder titled "Lucas CNC Table- Type Vertical Milling Machine" containing maintenance records and work order records and/or requests prior to the loss;

39.    File folder titled "Scheiss Gear Hobber" containing maintenance records and work order records and/or requests prior to the loss;

40.    File folder titled "Meuser Horizontal Boring with DRO" containing maintenance records and work order records and/or requests prior to the loss;

41.    File folder titled "American Tool CNC Stand Bed Lathe" containing maintenance records and work order records and/or requests prior to the loss;

42.    File folder titled "Landis Plan cylindrical Grinder" containing maintenance records and work order records and/or requests prior to the loss;

43.    File folder titled "Granite Surface Block" containing maintenance records and work order records and/or requests prior to the loss;

44.    File folder titled "Wells Horizontal Band Saw" containing maintenance records and work order records and/or requests prior to the loss;

45.    File folder titled "Dreis & Krump Press Brake" containing maintenance records and work order records and/or requests prior to the loss;

46.    File folder titled "Cryil Bath Press Brake" containing maintenance records and work order records and/or requests prior to the loss;

47.    File folder titled "Cincinnati Shear" containing maintenance records and work order records and/or requests prior to the loss;

48.    File folder titled "SMT Plate Bending Rolls" containing maintenance records and work

order records and/or requests prior to the loss;

49.    Quotation for SMT Plate Bending Rolls: Estimate from Machinery, Inc. for $85,000;

50.    Quotation for Shiess Gear Hobber: Estimate from Prestige Equipment, Corp. $379,500;

51.    Quotation for Bertsch Pinch Type Plate Bending Rolls: Estimate from Machinery, Inc. $85,000;

52.    Quotation for Cincinnati & Landis Grinders: Estimate from GCH Machinery: For plain hydraulic grinder – $55,000; for Landis Model Grinder – as is $45,000, reconditioned $89,500;

53.    Quotation for CNC Straight Bed Engine Lathe: $59,500;

54.    Quotation for Flat Bed Lathe: Estimate from DynaPath in the sum of $42,435;

55.    Quotation for Grinding Machine – Estimate from Schiess Moweg in the sum of 89,500 Euros;

56.    Expert Report of Jim Leigh, Pyramid Rebuild & Machine dated May 24, 2005; and

57.    Supplemental Expert Report of Jim Leigh, Pyramid Rebuild & Machine dated September 26, 2005;

Defendant's proposed exhibits are as follows:

(a)    AM 00001-00003

AM 00004-00009

AM 00015-00046

AM 00047-00058 (original color photographs)

AM 00059-00067 (original color photographs)

AM 00068-00072

AM 00073-00076

AM 00199-00292

AM 00204

AM 00205-00212

AM 00220-00221

AM 00222-00223

AM 00225-00226

AM 00228-00232

AM 00235-00242

AM 00244-00248

AM 00347-00378

AM 00305-00413

(b)    All exhibits from the following depositions:

Neil Andersen

Atlantic Mutual (James O'Keefe)

APEC (Paul O'Neill, Jr.)

Richard Benedetti

Building 58, LLC (Joseph Sugar)

Gerard Carreau

Stoy Machine and Gear, Inc. (Brenda Stoy O'Neill)

Bruce Walker

(c)    B58 42-79

B58 93

B58 96

B58 104

B58 110

B58 111

B58 151

B58 192

B58 193

B58 194

B58 237

B58 252-255

B58 333

B58 335

B58 340

B58 341

B58 392

B58 394

B58 396

B58 397

B58 398

B58 399

B58 400

B58 401

B58 402

B58 403

B58 404

B58 405

B58 406

B58 407

B58 410

B58 411

B58 412-413

B58 414

B58 415

B58 416

B58 417

B58 418

B58 419

B58 421

B58 425

B58 426

B58 427

B58 428

B58 429

B58 431

B58 432

B58 433

B58 434

B58 435-436

B58 440

B58 441-522

B58 437-439

(c)     APEC photographs taken by Eastern Adjustment (Douglas Dodge)

(d)     APEC photographs taken by Peterson & Associates (Bruce Walker)

(e)     APEC photographs taken by Paul O'Neill

(f)     APEC video taken by Paul O'Neill

(g)     August 8, 2002 memo from National Remanufacturing to APEC

(h)     APEC Purchase Order to Myron Bowling Associates, Inc. (November 14, 2001)

(i)     Koster Industries, Inc. Invoice to APEC (June 21, 2001)

(j)     Plant and Machinery Seller Recap Sheets for APEC Auction (October 17, 2002)

(k)     November 6, 2002 letter from Plant and Machinery, Inc. to APEC

(l)     Copy of check #1158 of Sunnyside Realty Trust (April 12, 2002)

(m)     Contract of Sale between Building 58 Nominee Trust and Building 58, LLC

(n)     Lease between Building 58 LLC and APEC

12.    **Objections To Any of the Proposed Evidence**

The parties hereto will meet prior to trial to identify and mark their respective exhibits and make reasonable attempts to stipulate to the admission of exhibits identified above. With respect to exhibits that the parties cannot so stipulate, the objecting party will file a motion *in limine* at least one week prior to trial stating its objection to the proposed exhibit.

24

Respectfully submitted,

**PLAINTIFF,**
**AMERICAN PROCESS EQUIPMENT**
**COMPANY, INC.,**

By its attorneys,

  /s/ Noah Rosmarin
David L. Kelston, BBO # 267310
Noah Rosmarin, BBO # 630632
ADKINS, KELSTON & ZAVEZ, P.C.
90 Canal Street
Fifth Floor
Boston, MA 02114
(617) 367-1040

**DEFENDANT,**
**ATLANTIC MUTUAL INSURANCE**
**COMPANIES,**

By its attorneys,

  /s/ Nancy M. Cremins
John E. Tener, BBO # 563791
John R. Bauer, BBO # 630742
Nancy M. Cremins, BBO # 658932
ROBINSON & COLE, LLP
One Boston Place
Boston, MA  02108
(617) 557-5900

Dated: October 28, 2005