UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AMERICAN PROCESS EQUIPMENT COMPANY, INC., <br><br>  Plaintiff, <br><br> v. <br><br> ATLANTIC MUTUAL INSURANCE COMPANY <br><br>  Defendant. | Civil Action No. 04-10736 (NMG) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
ATLANTIC MUTUAL INSURANCE COMPANY'S MOTION TO EXCLUDE
AMERICAN PROCESS EQUIPMENT COMPANY'S EXPERT**

At trial, this case will focus on whether Plaintiff American Process Equipment Company, Inc. ("APEC") defrauded Defendant Atlantic Mutual Insurance Company ("Atlantic Mutual") by submitting a property insurance claim that grossly misrepresented the extent of damage to machines caused by an alleged Spring 2002 roof leak at APEC's Hingham Facility and the cost of repairing and/or replacing those machines.

In support of its position that the estimates it provided to Atlantic Mutual were not fraudulent, APEC intends to offer the expert testimony of James Leigh ("Leigh"), the co-owner of a machine tool repair shop. Leigh is expected to testify about the extent of damage suffered by -- and the costs of repairing or replacing -- twenty-four (24) of the thirty-one (31) machines APEC alleges were damaged in Spring 2002. A copy of Leigh's initial expert report ("Leigh Report") is attached hereto as Exhibit 1.

Leigh is expected to offer testimony concerning the extent of water damage suffered by nine (9) APEC machines that Leigh inspected in Spring 2005, three years after the machines allegedly were damaged and approximately two and a half years after the machines had been dismantled, relocated from Hingham to Ohio and placed in storage. Leigh also is expected to testify about the costs to repair those machines. The Court should exclude Leigh's testimony concerning nine (9) machines that he inspected because Leigh has conceded that he does not know whether the damage to those machines that he observed in Spring 2005 were due to the alleged Spring 2002 roof leak or prior or subsequent causes. See Deposition Transcript of James Leigh ("Leigh Depo. Tr."), 38:6-8; 44:18-20; 53:10-13; 55:3-7; 56:22-57:1; 61:14-18. Copies of the relevant pages of the Leigh Depo. Tr. are attached as Exhibit 2.

Leigh also is expected to offer estimates of the costs of replacing fifteen (15) machines that he never inspected. Leigh conceded that has no knowledge of the condition of any of those fifteen (15) machines prior to Spring 2002 and yet his estimates of replacement costs are based only on quotations that he obtained from tool dealers for what he terms "similar" machines. The Court should exclude Leigh's testimony because he has no knowledge concerning the condition of those machines prior to the Spring 2002 roof leaks and thus no basis for determining whether

the machines for which he obtained quotations were, in fact, "similar" to those machines that APEC alleges were damaged in Spring 2002.

## FACTUAL BACKGROUND

*APEC alleges that its equipment suffered damage sometime between late March and mid-April 2002.*

From 1992 to November 2002, APEC operated a custom machine shop in space that it leased in a building located at 295 Lincoln Street, Hingham, Massachusetts (the "Hingham Facility"). Deposition Transcript of Paul O'Neill ("O'Neill Depo. Tr."), 24:11-15; Deposition Transcript of Gerard Carreau ("Carreau Depo. Tr."), 13:7-23. Copies of the relevant pages of the O'Neill Depo. Tr. are attached as Exhibit 3. Copies of the relevant pages of the Carreau Depo. Tr. are attached as Exhibit 4. APEC alleges that during a rainstorm that occurred sometime between late March and mid-April 2002, the roof at the Hingham Facility leaked causing water damage to various machines and equipment. Complaint, ¶ 4; O'Neill Depo. Tr., 64:2-10.

In or about April 2002, APEC first submitted a claim under a property insurance policy issued by Atlantic Mutual. On July 18, 2002, APEC submitted its Sworn Statement in Proof of Loss to Atlantic Mutual alleging that as a result of the roof leak that occurred on April 3, 2002, APEC machines and equipment suffered damages in excess of $3 million (the "Claim"). APEC's Proof of Loss included a list of thirty-one (31) allegedly damaged machines and APEC's estimates of the cost of repairing or replacing those machines. A copy of the Proof of Loss is attached as Exhibit 5.

*APEC sold, abandoned or relocated the allegedly damaged equipment in Fall 2002.*

In the months following the alleged rainstorm that is the basis of APEC's Claim, the roof at the Hingham Facility continued to leak and water continued to leak onto APEC's machines.

In APEC's Answers to Atlantic Mutual's Interrogatory No. 10, it states: "APEC experienced water leaks at the Property in April 2002, May 2002 and October 2002." In a memo dated April 15, 2002, referencing "last nights [sic] rainstorm," APEC notified its landlord of additional leaks at the Hingham Facility. A copy of this memo is attached as Exhibit 6. The memo goes on to state, "Please advise when we can anticipate the repairs being performed as it is causing unsafe working conditions and damage to machinery and work in process." In addition, in an April 26, 2002 memo to its landlord, APEC referenced "massive leaks in the factory." A copy of this memo is attached as Exhibit 7. The memo goes on to state, "We had a deluge on April 22, 2002 and again last night. All of our efforts to mitigate damage to our equipment and work in progress is [sic] thwarted by your inattentiveness to the repair of the roof." Moreover, APEC has provided video evidence that records rain leaking on machines in the Hingham Facility -- on July 19, 2002.

 On or about October 17, 2002, five months after APEC's landlord obtained a judgment in its favor evicting APEC from the Hingham Facility and six months after APEC's lease had expired, APEC auctioned machines, equipment, tools, vehicles and other property, including the equipment that allegedly suffered damaged in the rainstorm that occurred sometime between late March and mid-April 2002 that is the subject of the Claim. APEC sold some of the allegedly damaged machines at the auction. APEC abandoned some of the allegedly damaged machines that did not sell at auction, and APEC relocated others to various locations in Ohio, some of which have remained in storage since the relocation. The Okuma Engine Lathe LS, the Lucas CNC-type Horizontal Milling Machine ("Lucas 441-B"), the Fuji Seiki Gap Bed Engine Lathe and the Ooya Vertical Milling Machine were transported from APEC's Hingham Facility to Stoy Machine and Gear in Brunswick, Ohio. O'Neill Depo. Tr., 140:10-141:17; 183:11-185:10;

Carreau Depo. Tr., 57:21-58:6; 68:1-70:15; 81:1-84:4; 93:24-102:18. The Niles Bement Pond Vertical Turret Lathe, the Lucas CNC Table-Type Vertical Milling Machine ("Lucas VM-4"), the Clausing Engine Lathe, the Scheiss Gear Hobber and the Meuser Horizontal Boring Mill with DRO were relocated from the Hingham Facility to Lucco Properties in Akron, Ohio for storage. Carreau Depo. Tr., 62:22-67:10; O'Neill Depo. Tr. 150:7-23; 186:24-189:1; 193:13-24; 195:1-197:11.

***Leigh inspected only nine (9) of the allegedly damaged machines, and his inspections occurred in 2005, three years after the machines allegedly were damaged.***

Because APEC sold or abandoned most of the allegedly damaged machines, only nine (9) machines were available for Leigh's inspection. Leigh Report at 2.[5] Leigh inspected the nine (9) machines either at Stoy Machine in Brunswick, Ohio or Lucco Properties in Akron, Ohio. Id. at 1. Leigh inspected the machines on March 30, April 20, and/or May 11, 2005, i.e., ***three years after the machines allegedly suffered damage***. Id. at 3.

With respect to the nine (9) machines that Leigh inspected, Leigh provides a statement of the "scope of repair" and an estimate of the repair cost. Leigh does not provide estimates of the costs of replacing the nine (9) machines he inspected. Id., Exhibit entitled "Cost to Repair or Replace Equipment." While Leigh states that his estimates of the costs of repairing the nine (9) machines that he inspected "reflect only that damage I believe to be caused by water," he does not state, nor could he, that the damage he inspected occurred sometime between late March 2002 and mid-April 2002. During the course of Leigh's deposition when specifically asked when the water damage to each of the machines occurred, Leigh responded that he did not know. Leigh Depo. Tr., 38:6-8; 44:18-20; 53:10-13; 55:3-7; 56:22-57:1; 61:14-18. Leigh further

---

[5] The nine (9) machines that Leigh inspected are: Okuma LS Engine Lathe, Clausing Engine Lathe, Niles Bement Pond Vertical Boring Mill, Fuji Seiki Gap Bed Engine Lathe, Ooya Vertical Milling Machine, Lucas CNC Table-Type Horizontal Milling Machine, Lucas CNC Table Type Vertical Milling Machine, Scheiss Gear Hobber, Meuser Horizontal Boring Mill. Leigh Report at 2.

admitted that the damage he observed to the machines could have occurred anytime before or after March 2002. Id., 38:9-14; 66:18-67:2.

With respect to those fifteen (15) machines that he did not inspect,[6] Leigh does not provide repair cost estimates or descriptions of the necessary repairs. Leigh Report, at 3. Rather, with the exception of one machine that he considers "very unique," Leigh simply provides "quotations from machine tool dealers for similar machine tools," i.e., "equipment that is as close to capacity and specification that I could find." Id. at 2. Leigh concedes that his replacement cost estimates for the fifteen (15) machines that he did not inspect did not take into account the condition of those machines prior to the alleged damage, the age of the machines or whether they were even assembled while at APEC. Leigh Depo. Tr., 72:15-74:11. In fact, the machines that Leigh did not inspect were in various stages of disrepair prior to the rainstorm that occurred sometime between late March and mid-April 2002. For example, both the Scheiss Gear Hobber and the Meuser Horizontal Boring Mill with DRO were never assembled or operational at APEC. Carreau Depo. Tr., 121:8-126:24; 127:1-128:5. In addition, the Lucas 441-B was never operated at APEC, so it is impossible to know if the machine was damaged due to the rain. Id., 68:1-69:15.

## LEGAL ARGUMENT

The admission of expert testimony is governed by Fed. R. Evid. 702. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

---

[6] Leigh's Report does not provide repair or replacement cost estimates for several machines or pieces of equipment that APEC alleges were damaged in the rainstorm that occurred sometime between late March and mid-April 2002. Leigh states that these excluded machines "are not within my area of expertise." Leigh Report at 2.

6

principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

Rule 702 "imposes a gate-keeping function on the trial judge to ensure that an expert's testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" United States v. Mooney, 315 F.3d 54, 62 (1st Cir. 2002), quoting Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 597 (1993). The gate-keeping function applies to technical and other specialized knowledge in addition to scientific testimony. Seahorse Marine Supplies, Inc. v. P.R. Sun Oil Co., 295 F.3d 68, 81 (1st Cir. 2002), citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999). The trial court must make a preliminary determination that expert testimony is both reliable and relevant before it may be admitted. Daubert, 509 U.S. at 581.

The "overarching issue" in a court's assessment of proposed expert testimony "is the scientific validity – and thus the evidentiary relevance and reliability – of the principles that underlie a proposed submission." Daubert, 509 U.S. at 594-595. Unreliable expert testimony can be unfairly prejudicial because "expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." Id. at 595.

An expert witness' opinion is admissible only if it has "a reliable basis in the knowledge and experience of his discipline." Kumho Tire, 526 U.S. at 148, quoting Daubert, 509 U.S. at 592. An expert witness must demonstrate that "the reasoning or methodology underlying the testimony is scientifically valid." Id. at 26. Conclusions based on personal observations are no less susceptible to an analysis of relevance and reliability. Kumho Tire, 526 U.S. at 157. Personal observations are reliable only if the proponent can demonstrate that the method of personal observation is generally accepted by the relevant scientific community or otherwise reliable to support a scientific conclusion relevant to the case. Id. at 150-151.

7

The Supreme Court set forth several factors in Daubert that a court may consider in assessing whether an expert's conclusions are relevant and reliable. These factors include whether a theory or technique used by the expert: "(1) "can be and has been tested;" (2) "has been subjected to peer review and publication;" (3) has a "known or potential rate of error and whether there are standards controlling the techniques in operation;" and (4) "enjoys 'general acceptance' within a 'relevant scientific community.'" Id. at 149-50, quoting Daubert, 509 U.S. at 592-94. "Where expert testimony is not adaptable to being put through the ringer of falsifiability, publication, and peer review, the Trial Judge still has the obligation to determine whether the testimony is properly grounded, well-reasoned, and not speculative." Notes of Advisory Committee on 2000 amendments, Fed. R. Civ. P. 702

**I.   THE COURT SHOULD EXCLUDE LEIGH'S TESTIMONY CONCERNING THE NINE MACHINES HE INSPECTED IN 2005 BECAUSE HE HAS NO WAY OF KNOWING IF THE DAMAGE THAT HE OBSERVED WAS CAUSED IN SPRING 2002.**

Leigh is expected to offer opinions as to the extent of water damage and costs of repairing nine (9) of the thirty-one (31) machines for which APEC seeks coverage. Leigh's opinions of the estimated repair costs are based on his inspections of those nine (9) machines. Leigh's inspections occurred on March 30, April 20 and May 11, 2005, three years after the machines allegedly suffered damage. However, Leigh admits that he does not know if the damage to the machines that he observed in Spring 2005 was caused by the rainstorm and leaks that APEC alleges occurred sometime between late March and mid-April 2002 or if the damage he observed was due to prior or subsequent causes. For example, Leigh does not know if the damage that he observed occurred prior to Spring 2002, or later in 2002, when water continued to leak on to the machines while they were still located in the Hingham Facility. Leigh also does not know if the damage that he observed occurred during the relocation of the machines from

Hingham to Ohio in Fall 2002 or if the damage occurred during the two and a half years the machines were located in Ohio.

Accordingly, Leigh cannot provide reliable opinions as to the extent of damage caused to the nine (9) machines by water leaking on those machines sometime between late March and mid-April 2002, three years before he inspected the machines. For this reason, the Court should exclude Leigh's testimony concerning the extent of damage to and costs of repairing the nine (9) machines he inspected. Mink Mart, Inc. v. Reliance Ins. Co., 65 F. Supp. 2d 176 (S.D.N.Y 1999) (expert's opinion is unreliable because based on insufficient data and on investigation conducted three years after property damage); Dora Homes, Inc. v. Epperson, 344 F. Supp. 2d 875 (S.D.N.Y. 2004) (expert's analysis of soil sample taken at least six years after the alleged oil spill supports court's finding that expert testimony is unreliable); Williams v. Briggs Co., 62 F.3d 703, 707-8 (5th Cir. 1995) (upholding exclusion of testimony about water heater malfunction where the expert conducted a test two years after the accident and after various, unspecified repairs were made); Romano v. Ann & Hope Factory Outlet, Inc., 41 A.2d 1375, 1379-80 (R.I. 1980) (upholding trial court's discretionary exclusion of design-defect testimony where the expert examined the bicycle two years after the accident and after a previous expert's experiments).

**II.   THE COURT SHOULD EXCLUDE LEIGH'S TESTIMONY CONCERNING THE ESTIMATED COSTS OF REPLACING THE FIFTEEN MACHINES THAT HE NEVER INSPECTED BECAUSE HE HAS NO KNOWLEDGE OF THE CONDITION OF THOSE MACHINES PRIOR TO SPRING 2002.**

Leigh is expected to offer opinions concerning the costs of replacing fifteen (15) machines that he never inspected because APEC sold or abandoned the machines in Fall 2002. Leigh's opinions are not based on knowledge or experience in the area of buying or selling machines such as those APEC alleges were damaged. Rather, Leigh simply provides quotations

from machine tool dealers for machines that he determined were "similar" to those which APEC alleges were damaged in Spring 2002. By "similar," Leigh means "equipment that is as close to capacity and specification that I could find." Leigh Report at 2. Leigh states in his deposition that he did not take into account the condition of the fifteen (15) machines he did not inspect in reaching the replacement cost estimates. Leigh Depo Tr., 72:15-74:11.

      The Court should exclude Leigh's testimony concerning the fifteen machines that he never inspected. Because Leigh has no knowledge concerning the condition of the fifteen machines prior to the Spring 2002 rainstorm, his determination that the machines for which he obtained quotations are "similar" to APEC's machines is altogether unreliable. For example, Leigh bases his estimate of the cost to replace APEC's Betts Vertical Boring Mill on a single price quotation for a machine that was, according to the quotation, a "complete rebuild in 1994" and in "excellent condition." See Quotation attached as Exhibit 8. Insofar as Leigh has no knowledge of the condition of the Betts Vertical Boring Mill prior to the Spring 2002 damage, his determination that the machine for which he obtained the price quotation is "similar" to APEC's Betts Vertical Boring Mill is altogether unreliable. Similarly, notwithstanding his lack of knowledge concerning the condition of APEC's Comet Milling Machine, Leigh based his estimate of the cost of replacing the Comet Milling Machine on a price quotation for a machine that is, according to the seller, in "extra clean" condition. See Quotation attached as Exhibit 9. Insofar as Leigh had no knowledge of the condition of the Comet Milling Machine, his determination that the machine for which he received a price quotation is "similar" to the Comet is completely unreliable. Accordingly, the Court should exclude Leigh's estimates of the cost of replacing machines that he never inspected and as to which he has no knowledge concerning their condition prior to the Spring 2002 rainstorm. Bourelle v. Crown Equipment Corp., 220 F.3d

532, 537-38 (7th Cir. 2000) (court upheld exclusion of expert because the expert's opinion was unreliable due in part to expert's failure to inspect the forklift about which he was opining); Ortiz-Semprit v. Coleman Co., Inc., 301 F.Supp.2d 116, 121 (D.P.R. 2004) (court excluded expert's opinion as unreliable due to expert's failure to inspect the generator or scene of the accident); see also Polaino v. Bayer Corp., 122 F. Supp. 2d 63, 67 (D. Mass. 2000) ("trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable."); Daubert, 509 U.S. at 590 ("trial judge must also insure that the expert's opinion is based upon "more than subjective belief or unsupported speculation. . . . Proposed testimony must be supported by appropriate validation -- i.e., 'good grounds,' *based on what is known*.") (emphasis added).

      The unreliability of Leigh's opinions that the fifteen machines he did not inspect were "similar" to those for which he obtained quotes is underscored by the poor condition of at least some of APEC's machines prior to Spring 2002. For instance, at least three of APEC's machines, including the Scheiss Gear Hobber, the Meuser Horizontal Boring Mill with DRO and the Lucas 441-B, had been disassembled and/or inoperative at APEC for several years prior to the Spring 2002 rainstorm that allegedly damaged those machines. Without knowledge of the condition of those machines prior to Spring 2002, Leigh simply could not have made reliable determinations as to what constituted a "similar" machine. Leigh's testimony regarding the value of the fifteen (15) machines that he never inspected "rests on unverified assumptions, speculations and guess work." Polaino, 122 F. Supp. 2d at 69 (court excluded expert's opinion based on expert's failure to investigate the facts upon which his hypothesis was based). Accordingly, the Court should exclude Leigh's testimony. Morehouse v. Louisville Ladder Group, LLC, Civ. Act. No. 3:03-887-22, 2004 WL 2431796, *5 (D.S.C. Jun 28, 2004) (court

excludes testimony of expert as unreliable because expert does not know and has no way of knowing the condition of the ladder prior to the accident and there is no evidence that the ladder was in the same condition on the date of the accident as when it was purchased). A copy of this decision is attached as Exhibit 10.

Additionally, Leigh's opinions about the costs of replacing APEC's allegedly damaged machines are not based on his expertise. Rather, they are based on quotations he obtained from machine tool dealers. It does not take any specialized skill to obtain quotations. Part of the gatekeeping function of the judge is to determine whether the expert's opinion has the capacity to assist the fact finder in deciding a material fact. Polaino, 122 F. Supp. 2d at 67. Leigh's "opinions" are based solely on the machine quotes he obtained and will not assist the jury in any way. In addition, Leigh does not have expertise in evaluating replacement costs for machines. See Leigh Depo. Tr., 20:7-15. Accordingly, Leigh's opinions about replacement costs should be excluded. Bogoasian v. Mercedes-Benz of North America, Inc., 104 F.3d 472, 477 (1st Cir. 1997) (court affirmed the exclusion of an expert witness because of lack of expertise in relevant areas).

## **CONCLUSION**

For the foregoing reasons, the Court should exclude Leigh's testimony from trial.

                                              Respectfully submitted,

                                              **ATLANTIC MUTUAL INSURANCE COMPANY**
By its attorneys,

                                              /s/ Nancy M. Cremins
John E. Tener (BBO# 563791)
John R. Bauer (BBO# 630742)
Nancy M. Cremins (BBO# 658932)
**ROBINSON & COLE LLP**
One Boston Place, 25th Floor
Boston, MA  02108-4404
(617) 557-5900

Dated: October 28, 2005