Not Reported in F.Supp.2d                                                                                           Page 1
Not Reported in F.Supp.2d, 2004 WL 2431796 (D.S.C.), Prod.Liab.Rep. (CCH) P 16,976
(Cite as: 2004 WL 2431796 (D.S.C.))

C

**Motions, Pleadings and Filings**

United States District Court,
D. South Carolina.
Dr. Jeffrey MOREHOUSE, Plaintiff,
v.
LOUISVILLE LADDER GROUP LLC, Defendant.
No. Civ.A. # 3:03-887-22.

June 28, 2004.

Samuel K. Morgan, Jr., Walker Morgan and Kinard, Lexington, SC, for Plaintiff.

Christopher James Daniels, Nelson Mullins Riley and Scarborough, Columbia, SC, for Defendant.

ORDER

CURRIE, J.

*1 This matter is before the court on Defendant's motions to exclude the opinion testimony of Plaintiff's expert witness and for summary judgment. Defendant Louisville Ladder Group ("LLG") claims that the testimony of Plaintiff's expert, Dr. Brian Durig, is unreliable under the standards set forth in Federal Rule of Evidence 702 and Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and should therefore be excluded. Moreover, Defendant LLG asserts that excluding Durig's opinion testimony renders Plaintiff's claims for strict product liability and negligence critically deficient as a matter of law. LLG therefore contends that in the event the court grants its motion to exclude Dr. Durig's testimony, LLG is entitled to summary judgment as well.

Following a hearing and a careful review of the complete record in this case, the court now grants both of Defendant's motions for the reasons set forth below.

I. FACTUAL AND PROCEDURAL BACKGROUND

Taken in the light most favorable to Plaintiff, the facts are as follows. On August 24, 2002, Plaintiff Jeffrey Morehouse was using a six (6) foot aluminum stepladder while working in the tack room on his daughter's farm. The ladder was a Louisville Ladder Model L2311-06S and was manufactured by Defendant in Mexico in June 2002. Plaintiff's daughter purchased the ladder at Home Depot shortly before the date of Plaintiff's accident. The ladder was rated by Defendant to bear a maximum weight of two-hundred (200) pounds.

Plaintiff positioned the ladder on the concrete floor at the corner of the tack room in order to nail some wood timbers to the wall. According to Plaintiff, all four feet of the ladder were squarely on the concrete floor. Plaintiff asserts that on the date of the accident, he weighed approximately 175 to 185 pounds and was carrying no more than 15 pounds of equipment while using the ladder. As Plaintiff was standing on the second step from the bottom and began pivoting to his right, clockwise as facing the ladder, one of the side rails allegedly failed, causing Plaintiff to fall to the concrete floor. As a result of the accident, Plaintiff sustained an open proximal humerous fracture of the shoulder and an injured back. [FN1] Plaintiff also suffered substantial memory loss as a result of his fall and still is unable to remember any of the details of his accident. See Morehouse Dep. at 16 ("I've never had a gap in memory before. This is my first gap in memory at age 60. It's amazing."), 32-34 (stating that Plaintiff cannot recall what lateral movements he was making on the ladder at the time of the accident but that he can now imagine multiple different scenarios that might have taken place resulting in his fall).

> FN1. In his response to Defendant's summary judgment motion, counsel for Plaintiff claims that Plaintiff "does not believe he physically impacted any portion of the ladder during the fall" and that "[h]is body had no cuts, bruises, or scrapes, with the only serious injury being the open proximal humerous fracture of the shoulder." Plaint. Memo. in Opp'n to Def. Mot. for Summ. J. at 2. These assertions contradict his earlier deposition testimony, however, when Plaintiff attested that he was uncertain whether any portion of his body came in contact with the ladder during the fall and that he wrenched his back so badly that he "thought [he] had a nail stuck in [it]." Morehouse Dep. at 42.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 2
Not Reported in F.Supp.2d, 2004 WL 2431796 (D.S.C.), Prod.Liab.Rep. (CCH) P 16,976
**(Cite as: 2004 WL 2431796 (D.S.C.))**

> It appears that counsel for Plaintiff is attempting to counter any argument by Defendant that the ladder's bent leg occurred as a result of Plaintiff landing on the ladder during his fall rather than as a result of the ladder's leg improperly collapsing and buckling. However, Plaintiff, once uncertain as to how the damage to the ladder occurred, cannot now create an issue of material fact by claiming through counsel that he did not come into contact with the ladder during his fall. Accordingly, for purposes of this order, the court adopts Plaintiff's earlier deposition testimony as the more accurate and reliable version of the facts.

On February 18, 2003, Plaintiff initiated this action against Defendant in the Richland County Court of Common Pleas, asserting claims for strict product liability and negligence. [FN2] Prior to filing suit against Defendant, however, Plaintiff contacted Brian Durig, Ph.D., a mechanical engineer with Summit Engineering, LLP ("Summit"), on October 17, 2002 to assist in determining the cause of Plaintiff's ladder accident. In his work for Summit, Dr. Durig performs specialized consulting in the areas of accident evaluation, failure analysis, and products liability, to include analysis and evaluation of machinery, equipment, and consumer product designs. In preparing his opinion testimony, Dr. Durig discussed the events of the accident with Plaintiff, conducted an on-site inspection of the location where the accident occurred, and employed an exemplar ladder in an effort to recreate the conditions at work prior to the accident. These three steps constituted the entirety of Dr. Durig's investigation into the cause of Plaintiff's accident.

> FN2. On March 20, 2003, Defendant removed this action pursuant to 28 U.S.C. § 1332.

*2 On August 22, 2003, Dr. Durig produced a written report on Plaintiff's accident. In his report, Dr. Durig concluded that Plaintiff's accident occurred because Defendant's ladder lacked the overall strength necessary to support foreseeable loading conditions during usage. Durig reached this conclusion in the following way:

> On the exemplar ladder, after setting up the exemplar ladder on a firm level surface, the construction (strength of design and weight) of the ladder allows the legs to move several inches as one climbs the ladder. After numerous trips up and down the ladder, both front side rails show evidence of permanent deformation. The deformation is in a rotational mode, similar to the subject ladder that failed and caused [Plaintiff's] injury. It is not known at this time if this is a result of a manufacturing defect caused by the length of the braces and the position of the holes connecting the braces to the rails and step. Additional exemplar ladders are currently being located to examine and determine if this condition exist [sic] of other ladders before any use of the ladder. The design drawings, which are mainly in Spanish, show the side rails as being straight, without any curvature in the bottom section. The inward curvature of the bottom section of the side rail reduces the overall strength of the ladder by increasing the probability of the lower section of the rail buckling or rotating as the ladder that caused [Plaintiff's] injury did.... If the manufacturing is such that the side rails are straight then that implies very minor usage of the ladder caused the lower sections of the rail to permanently deflect inward, increasing the probability of the legs buckling. If minor use caused this inward curvature of the rail, it would be considered a design defect.

Durig Report at 3. Dr. Durig also was able to conclude in his report that the tack room concrete flooring, which had less than a one percent (1%) slope in the area where Plaintiff had positioned the ladder, did not contribute to the failure of the ladder's side rail. Durig was unable to determine, however, whether the accident ladder's rails were already bent inward prior to Plaintiff's accident, [FN3] see Durig Dep. at 96, or whether Plaintiff had extended his center of gravity outside the "footprint" of the ladder at the time of the accident. See id. at 92.

> FN3. Plaintiff's daughter, Katie Gesell, claims that the accident ladder had not been used prior to August 24, 2002-the date of Plaintiff's accident. See Gesell Dep. at 25. Neither Plaintiff nor Dr. Durig is able to state with any certainty, however, the precise condition of the ladder immediately prior to the accident. Plaintiff also cannot recall how many times he and his daughter used the ladder on the date of the accident prior to Plaintiff's fall.

In his report, Dr. Durig lists several measures that could have been taken by Defendant to strengthen the lower portions of the side rails and thus increase the overall strength of the ladder. Dr. Durig asserts that the lower sections of the front and rear side rails could have been flared outward slightly to prevent

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  Page 3
Not Reported in F.Supp.2d, 2004 WL 2431796 (D.S.C.), Prod.Liab.Rep. (CCH) P 16,976
**(Cite as: 2004 WL 2431796 (D.S.C.))**

inward curvature after minor usage. Dr. Durig also maintains that the lowest section of the side rails could have been strengthened either by lowering the first step of the ladder or increasing the strength of the side rail component. According to Durig, any of these precautions taken by Defendant would prevent accidents such as the one suffered by Plaintiff.

*3 On December 11, 2003, Defendant filed a motion to exclude Dr. Durig's expert testimony, stating that Durig's opinions fail to meet the admissibility criteria set forth in Rule 702 and *Daubert* and therefore must be excluded. Defendant also claims that "excluding Dr. Durig's opinion testimony renders plaintiff's product liability action critically deficient as a matter of law," Def. Mot. for Summ. J. at 1, thereby entitling Defendant to summary judgment as well.

On January 20, 2004, Plaintiff filed a response to Defendant's motions, asserting that "Dr. Durig's opinions are clear, reliable, and trustworthy" and that [b]oth the letter and spirit of Rule 702 have been met by Plaintiff." Plaint. Memo. in Opp'n to Summ. J. at 8. Plaintiff contends that Defendant's motion to exclude Dr. Durig's expert testimony should therefore be denied. Plaintiff also claims that Defendant's motion for summary judgment fails to show the lack of any genuine issue of material fact and should likewise be denied. *Id.*

On February 3, 2004, Defendant filed a reply to Plaintiff's opposition memorandum, reiterating its claims that Dr. Durig's opinion testimony should be excluded under Rule 702 and *Daubert* and that, as a result, Defendant is entitled to summary judgment.

Because Defendant is correct in asserting that Dr. Durig's opinion testimony is essential to Plaintiff's case, the court will first address Defendant's motion to exclude before turning to its summary judgment motion.

II. DEFENDANT LLG'S MOTION TO EXCLUDE DR. DURIG'S OPINION TESTIMONY

The introduction of expert opinion testimony is governed by Federal Rule of Evidence 702. Rule 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702, trial judges act as gatekeepers to "ensure that any and all scientific testimony ... is not only relevant, but reliable." *Daubert*, 509 U.S. at 579. This "basic gatekeeping obligation" of the trial court previously identified in *Daubert* and now embraced by Rule 702 applies not only to "scientific" testimony, but to all expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). [FN4] Indeed, as the Supreme Court has explained, "no clear line" divides " 'scientific' knowledge and 'technical' or 'other specialized' knowledge. Disciplines such as mechanical engineering rest upon scientific knowledge." *Id.* at 148.

> FN4. "Effective December 1, 2000, Rule 702 was amended to reflect the Supreme Court's recent decisions in *Daubert* and *Kumho*...." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 n. 1 (4th Cir.2001).

The gatekeeping function, like other determinations of admissibility of evidence, requires the trial judge to exercise an informed and broad discretion. *See Cooper*, 259 F.3d at 199. However, the court's role as a gatekeeper does not replace the traditional adversary system and the place of the jury within the system. *See Daubert*, 509 U.S. at 596. As with all other admissible evidence, expert testimony is subject to being tested by "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Id.* at 596. Thus, the *Daubert* inquiry does not require consideration of whether the proffered testimony is correct or whether the proffered evidence is sufficient to allow a verdict in favor of the proponent. Instead, the focus must be on whether the testimony is reliable and can aid the ultimate trier of fact. As the Fourth Circuit has explained, "courts must recognize that due to the difficulty of evaluating their testimony, expert witnesses have the potential to be both powerful and quite misleading." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir.1999) (quoting *Daubert*, 509 U.S. at 595). Indeed, because expert testimony can be very powerful, it is essential to ensure that only scientifically reliable methods are used to produce the opinions offered to a jury.

*4 Thus, under Rule 702, a two-step inquiry is relevant in cases such as this one: 1) whether the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2431796 (D.S.C.), Prod.Liab.Rep. (CCH) P 16,976
**(Cite as: 2004 WL 2431796 (D.S.C.))**

Page 4

expert witness is qualified; and 2) if qualified, whether his opinion is reliable, in that it is based on sufficient facts and sound methodology. In this case, Defendant does not challenge Dr. Durig's qualifications to testify as an expert on Plaintiff's behalf. *See* Def. Reply at 3 ("Louisville Ladder has not challenged Dr. Durig's qualifications as an expert in this case, but it agrees that the court must consider Dr. Durig's qualifications, including his education, experience and technical skills."). The court therefore immediately turns to the reliability of Durig's opinion testimony.

A. RELIABILITY OF DR. DURIG'S OPINION TESTIMONY

In *Daubert*, the Supreme Court laid out five non-exhaustive factors that a court may consider in determining whether to admit an expert opinion as reliable, to include: 1) whether a "theory or technique ... can be (and has been) tested"; 2) whether it "has been subjected to peer review and publication"; 3) whether, in respect to a particular technique, there is a high "known or potential rate of error"; 4) whether there are "standards controlling the technique's operation"; and 4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Kumho Tire,* 526 U.S. at 149 (quoting *Daubert,* 509 U.S. at 592-94). The *Daubert* factors "are meant to be helpful, not definitive," *id.* at 151, and "the court's evaluation is always a flexible one." *Oglesby v. General Motors Corp.,* 190 F.3d 244, 250 (4th Cir.1999). Indeed, as the *Kumho* Court noted, the factors do not all necessarily apply "even in every instance in which the reliability of scientific testimony is challenged." 526 U.S. at 149.

The inquiry underlying the *Daubert* factors involves not only whether the methodology that the expert used is generally accepted within the relevant scientific or professional community, but also whether it was reasonable for the expert to use that methodology to "draw a conclusion regarding the particular matter to which the expert testimony is directly relevant." *Id.* at 154. As the Fourth Circuit explained in *Oglesby,* "[a] reliable expert opinion must be based on scientific, technical or other specialized *knowledge* and not on belief or speculation, and inferences must be derived using scientific or other valid methods." 190 F.3d at 250 (citing *Daubert,* 509 U.S. at 592-93). To qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation--*i.e.*, "good grounds," based on what is known. *Daubert,* 509 U.S. at 590. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified.... The statements constituting a scientific explanation must be capable of empirical test." *Id.* at 593.

*5 Regarding the first *Daubert* factor, Defendant argues that Durig failed to apply the scientific method by not properly testing his hypothesis that the ladder's bent leg represented a product failure that caused Plaintiff's accident. *See* Durig Dep. at 114. In particular, Defendant claims that "[w]hile there are a multitude of validation options available, and Dr. Durig has laboratory equipment at his professional office, he did not conduct *any* scientific tests to validate his theory." Def. Mot. for Summ. J. at 7. According to Defendant, Dr. Durig refused to use any of the following reliable methods to test his theory that Defendant's ladder spontaneously buckled, causing Plaintiff's accident: 1) material testing to evaluate the hardness, and thus the strength, of the aluminum alloy; 2) ladder performance tests as described in the American National Standards Institute's ("ANSI") *Safety Requirements for Portable Metal Ladders;* 3) accident reconstruction; 4) computer modeling to determine and evaluate loads during ladder usage; and 5) engineering calculations to determine load capacity. *See id.* at 6. Defendant asserts that, in fact, the one method Durig actually *did* use to test his theory--a simulated climbing test on the exemplar ladder--did not bend the ladder leg in the same way that the accident ladder leg was bent following Plaintiff's accident. Durig Dep. at 121.

Plaintiff responds by stating that Dr. Durig performed numerous tests in order to reach his ultimate conclusion that the rail on Defendant's ladder failed, causing its collapse, to include:
> He took possession of the actual ladder involved in the accident. He visited the scene and took extensive photographs. During this field examination, the Plaintiff, Dr. Jeffrey Morehouse, was physically present, and positioned an exemplar ladder in the exact spot as on the day of the accident. Dr. During measured its location with reference to walls and fixed objects in the room. He determined with a digital level that the concrete floor had a slope of .7%. Dr. Durig extensively questioned Dr. Morehouse concerning his positioning and movements on the ladder before his fall. Durig reviewed documents produced by the Defendant, including but not limited to manufacturing blueprints.

Plaint. Memo. in Opp'n to Def. Mot. for Summ. J. at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d     Page 5
Not Reported in F.Supp.2d, 2004 WL 2431796 (D.S.C.), Prod.Liab.Rep. (CCH) P 16,976
**(Cite as: 2004 WL 2431796 (D.S.C.))**

3. Plaintiff asserts that, based on a thorough investigation, Dr. Durig was able to conclude that the rails of the accident ladder had a permanent deformation inward caused by Plaintiff's climbing on the ladder only "two or three times previous to the accident." *Id.* at 4. According to Dr. Durig, when Plaintiff ascended the ladder on the day of the accident and began rotating his body clockwise, this deformation "caused the lower section of the left side rail to buckle and the ladder to collapse." During Report at 4.

For the reasons set forth below, the court finds that Dr. Durig has not reliably tested his hypothesis that the ladder's bent leg represented a product failure that caused Plaintiff's accident. First, though he did inspect the accident ladder after Plaintiff's fall, Dr. Durig does not know--and Plaintiff is unable to recall--the condition of the ladder prior to the accident. Though Plaintiff's daughter attests that the accident ladder was not used prior to August 24, 2002, Plaintiff has submitted little evidence showing that the ladder was in the same condition on the date of the accident as when Plaintiff's daughter purchased it. Dr. Durig has also indicated that he cannot conclusively determine the condition of the ladder's rails immediately prior to Plaintiff's accident. As a result, Dr. Durig cannot state with any certainty whatsoever whether the accident ladder's rails were already bent inward prior to Plaintiff's accident by some *other* force occurring outside the ladder's normal expected use, which in turn caused the ladder to buckle beneath Plaintiff.

*6 In addition, because of Plaintiff's substantial memory loss, Dr. Durig is unable to state that the damage to the accident ladder did not occur from Plaintiff coming into contact with it during his fall. As previously mentioned, Plaintiff contends that his back was severely injured at some point during his accident. In light of this admission by Plaintiff, the court is unable to rule out that Plaintiff simply lost his balance and fell on the ladder, causing it to bend inward. Nor can Plaintiff's expert, Dr. Durig--who attested to being unable to determine whether Plaintiff's center of gravity at the time of the accident was outside the footprint of the ladder--account for this possibility when testing his hypothesis that the ladder spontaneously buckled because of a defective rail. By using performance tests and accident reconstruction, as Defendant has suggested, Dr. Durig possibly could have shown that the ladder's rail could not have been so damaged by Plaintiff's force on the ladder during a fall; however, Durig ultimately chose not to employ these techniques.

In sum, it is clear that Dr. Durig did not properly test his hypothesis that the ladder's bent rail represented a product failure that caused Plaintiff's accident. Rather, the conclusion is inescapable that to arrive at his opinion as to the cause of the accident, Durig first assumed that the bent leg on the ladder did not occur as a result of prior damage or Plaintiff's error; Durig then developed a seemingly plausible hypothesis--a weak or defective rail caused the ladder to buckle beneath Plaintiff--to conform to the condition of the ladder post-accident. For these reasons, the court finds Dr. Durig has not employed sound scientific or engineering methodologies to test his spontaneous buckling theory.

In addressing the second *Daubert* factor, Defendant contends that Dr. Durig's "spontaneous buckling theory ... could gain both credibility and the requisite indicia of reliability through review by the relevant engineering or scientific communities." *Id.* at 7. According to Defendant, Dr. Durig chose neither to conduct his only method of hypothesis testing-- climbing an exemplar ladder--under "controlled, monitored, or reproducible conditions," nor to videotape or otherwise measure the results of his climbing activity so that they could be reviewed and evaluated. *Id.* As stated by Defendant, "such scrutiny by the scientific community is important, not only because it establishes reliability, but because it is a component of 'good science.' " *Id.* (citing *Daubert, 509 U.S. at 594*).

Plaintiff responds by citing *Scordill v. Louisville Ladder Group, LLC*, No. 02-2565, 2003 U.S. Dist. LEXIS 19052, at *1 (E.D.La. Oct. 24, 2003) for the proposition that peer review of Dr. Durig's conclusions would not prove helpful in this case. In *Scordill,* plaintiff welder sustained injuries when Defendant LLG's ladder buckled beneath him while plaintiff was standing on the second rung with his back turned to the ladder. Though LLG moved to exclude as unreliable the testimony of plaintiff's expert, the court determined that the expert was indeed qualified to testify under Rule 702 and *Daubert.* In applying the second *Daubert* factor to the expert's testimony, the court held that because the expert's opinion was based on the very specific facts of plaintiff's case, it did not lend itself to peer review. As noted by the court, "[plaintiff's expert] has not generated a study that is subject to repetition but instead has applied generally accepted engineering principles and concepts utilized in stress analysis to the facts of this accident." *Id.* at *16. The court therefore found the second *Daubert* factor not to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-10736-NMG   Document 21-11   Filed 10/28/2005   Page 6 of 8

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2431796 (D.S.C.), Prod.Liab.Rep. (CCH) P 16,976
(Cite as: 2004 WL 2431796 (D.S.C.))

Page 6

apply.

*7 The court agrees with Plaintiff that to the extent that Dr. Durig's opinion is based on the very specific facts of this case, it does not lend itself to peer review. The court refuses to accept, however, any contention by Plaintiff that Durig's hypothesis testing--*i.e.*, climbing the exemplar ladder-- need not have been videotaped or otherwise recorded so that the results might be scrutinized by Defendant as well as others in the scientific community. For example, Dr. Durig stated in his report that "[a]fter numerous ascending and descending trips on the exemplar ladder, both front side rails show evidence of permanent deformation ." Durig Report at 3. In making this sweeping assertion, however, Dr. Durig failed to include several critical details of his hypothesis testing, such as the number of ascending and descending trips he took on the exemplar ladder before this "deformation" took place, or his body weight on the day of testing the exemplar ladder in comparison to Plaintiff's weight on the day of the accident. Because Durig failed to record his hypothesis testing or include relevant details in his report, it is extremely difficult for the court to evaluate the reliability of his work. Accordingly, the court finds that Dr. Durig's report also fails to possess the indicia of reliability necessary under the second *Daubert* factor.

The court finds the third and fourth *Daubert* factors inapplicable, as they involve the known or potential rate of error of the technique utilitized by the expert and whether there exist standards controlling the technique's operation. In this case, Dr. Durig did not develop a particular scientific procedure to reach his conclusions. Accordingly, the court will not consider such factors in making its ruling. See *Kumho Tire, 526 U.S. at 150* (stating that the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony").

Regarding the fifth *Daubert* factor, Defendant contends that "Dr. Durig's theory does not only lack general acceptance in the scientific community, it is not even known to it." Def. Mot. for Summ. J. at 11. As the basis for this claim, Defendant cites Dr. Durig's admission that he is not aware of anyone else in the scientific community who has verified the spontaneous buckling theory that Durig claims caused Plaintiff's injury. See Durig Dep. at 154. Because Durig readily admits that his spontaneous buckling theory has not been reviewed or accepted by his peers, Defendant claims that it therefore lacks the fifth and final indicia of reliability set forth in *Daubert*.

The court agrees with Defendant that the lack of acceptance by the scientific community of Durig's spontaneous buckling theory is probative. This noticeable absence of support for Dr. Durig's theory, coupled with the fact that Durig failed to videotape or otherwise measure his testing activity, compels the court to conclude that Durig's report fails the fifth *Daubert* factor as well.

*8 In sum, these flaws cast substantial doubt upon the reliability of Dr. Durig's opinion testimony. This is particularly true because Plaintiff bears the burden of establishing the admissibility of Durig's testimony by a preponderance of proof. See *Daubert, 509 U.S. at 592 n. 10*. Considered in the aggregate, these flaws raise a high inference of unreliability.

The flaws in the proffered expert testimony, however, are even more substantial than they initially appear. Based upon Dr. Durig's report and testimony, there is no sufficient basis upon which a reasonable juror could conclude that Plaintiff's normal use of the ladder caused such a bend in the ladder's rail. There are too many alternate theories of causation to Dr. Durig's spontaneous buckling theory for Plaintiff to establish causation by a preponderance of the evidence. Of course, ultimately, it is not Defendant's burden to prove that an alternate course of events caused the damage. Rather, it is the burden of Plaintiff to present evidence from which a jury could find that, more likely than not, the damage, and the accident, were caused by the ladder's spontaneous buckling. Neither Plaintiff nor his expert are capable of doing so. Thus, as Dr. Durig's conclusions have the potential to "be both powerful and quite misleading" to a jury, *id. at 596,* the court finds that they lack sufficient indicia of reliability under *Daubert*. Defendant's motion to exclude the expert testimony of Plaintiff's expert, Dr. Brian Durig, is therefore GRANTED.

III. DEFENDANT LLG'S MOTION FOR SUMMARY JUDGMENT

A. STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-10736-NMG   Document 21-11   Filed 10/28/2005   Page 7 of 8

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2431796 (D.S.C.), Prod.Liab.Rep. (CCH) P 16,976
**(Cite as: 2004 WL 2431796 (D.S.C.))**

Page 7

judgment as a matter of law." Fed.R.Civ.P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). When the defendant is the moving party and the plaintiff has the ultimate burden of proof on an issue, the defendant must identify the parts of the record that demonstrate the plaintiff lacks sufficient evidence. The nonmoving party, here the plaintiff, must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also generally Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

*9 A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985). Therefore, "[m]ere unsupported speculation ... is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir.1995).

B. DISCUSSION

Defendant asserts that Plaintiff's failure "to offer any credible evidence to establish causation" entitles Defendant to summary judgment on Plaintiff's claims for strict product liability and negligence. Def. Mot. for Summ. J. at 11. Under South Carolina law, [FN5] a plaintiff in a products liability suit must prove that the product defect proximately caused his injury. *See* F.P. Hubbard and R.L. Felix, *The South Carolina Law of Torts* 300 (2d ed.1997). The evidence proffered by the plaintiff must be sufficient to prove not only that the defendant's product was defective, but also that the defect was a direct and efficient cause of plaintiff's injury. *See Livingston v. Noland Corp.*, 293 S.C. 521, 362 S.E.2d 16, 18 (S.C.1987). The connection between product defect and injury must be established as a matter of probability, not mere possibility. *See e.g., Anderson v. Green Bull, Inc.*, 322 S.C. 268, 471 S.E.2d 708 (S.C.Ct.App.1995)(mere possibility that electrocution was result of arcing); *Harris v. Rose's Stores*, 315 S.C. 344, 433 S.E.2d 905 (S.C.Ct.App.1993)(mere possibility that fire was caused by defect in fan which was destroyed in fire).

> FN5. Because Plaintiff's injury in this case was sustained in South Carolina and removal was based on diversity of citizenship, *see* 28 U.S.C. § 1332, the court will apply the substantive law of South Carolina. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)(holding that in a diversity action the federal court applies the state's choice of law rules); *Lister v. NationsBank*, 329 S.C. 133, 494 S.E.2d 449, 454 (S.C.Ct.App.1998)(holding that under South Carolina choice of law principles the "substantive law governing a tort action is determined by the state in which the injury occurred").

As previously mentioned, Plaintiff cannot recall the events leading up to his accident and is unable to state what caused his fall. In fact, Plaintiff readily admits that he can now imagine multiple different scenarios that might have taken place leading up to, and ultimately causing, his accident. *See* Morehouse Dep. at 32. Plaintiff therefore relies almost exclusively on the opinion testimony of his expert witness, Dr. Durig, to establish the elements of his case. As determined in § II *supra*, however, Dr. Durig's opinion testimony is unreliable under the standards set forth in Rule 702 and *Daubert* and is thus inadmissible. In the absence of Durig's testimony, Plaintiff is unable to establish that Defendant's ladder was defective or that such defect caused Plaintiff's accident. *See Oglesby*, 190 F.3d at 250 (stating that "a plaintiff may not prevail in a products liability case by relying on the opinion of an expert unsupported by any evidence such as test data or relevant literature in the field").

Therefore, because the cause of Plaintiff's accident may be as reasonably attributed to an act for which Defendant is not liable as to one for which it is liable, Plaintiff has not met his burden of proof in demonstrating that his injuries were proximately caused by the product of Defendant. *See Messier v. Adicks*, 251 S.C. 268, 161 S.E.2d 845 (S.C.1968); *see also Brown v. Ford Motor Co.*, 287 F.Supp. 906 (D.S.C.1968)(right of recovery in a products liability case must be predicated on proof, either direct or circumstantial, that there was a defect in the product and that it was reasonably probable that such defect

Not Reported in F.Supp.2d                                                                 Page 8
Not Reported in F.Supp.2d, 2004 WL 2431796 (D.S.C.), Prod.Liab.Rep. (CCH) P 16,976
**(Cite as: 2004 WL 2431796 (D.S.C.))**

was a cause of the injuries in question). Summary judgment on Defendant's behalf is therefore proper. *See Harris*, 433 S.E.2d at 908 (citing *Crocker v. Sears Roebuck & Co.*, 346 So.2d 921 (Miss.1977)(where the evidence reveals several possible causes of an accident, it is improper to allow the jury to guess which cause might have been a proximate cause)).

**\*10** IT IS THEREFORE ORDERED that Defendant's motions to exclude the opinion testimony of Dr. Brian Durig and for summary judgment are GRANTED.

IT IS SO ORDERED.

**Motions, Pleadings and Filings (Back to top)**

•      3:03CV00887     (Docket) (Mar. 20, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.